IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHNNY L. CAMERON, #154328,      :

    Plaintiff,      :

vs.      :      CIVIL ACTION NO. 16-00230-WS-B

KIM THOMAS, *et al.*,      :

    Defendants.      :

## REPORT AND RECOMMENDATION

This § 1983 action is before the Court on Plaintiff Johnny L. Cameron's Amended Complaint (Doc. 42), which he filed while an Alabama prison inmate.[1] This action, for which Cameron paid the filing fee (Docs. 2, 44), has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). After careful review of the Amended Complaint and the proceedings in this action, it is recommended that the Amended Complaint be denied.

## I.  Posture of Action.

**A.  Complaint.** (Doc. 1).

Cameron, who is proceeding *pro se*, filed his original Complaint and supporting affidavit under §§ 1983 and 1988 (Doc. 1) on December 8, 2015 in the Middle District of Alabama.

---

[1] Subsequent to the Amended Complaint's filing, Cameron advised he was released on parole. (Doc. 45).

Washington v. United States, 243 F.3d 1299, 1300 (11th Cir. 2001) (the date an inmate signs his complaint is deemed to be the date he delivers it to prison officials absent evidence to the contrary). The incident forming the basis of his Complaint occurred on December 14, 2013, and Cameron alleges that it continues and, at the time of filing, had worsened. (Id. at 6). He named Kim Thomas (Thomas), the former Commissioner of the Alabama Department of Corrections (ADOC), and Corizon, Inc. (Corizon) as Defendants, and noted that the identities of other responsible individual Defendants will be determined through discovery. (Id.).

Cameron begins the Complaint by stating that when he was transferred from a county jail on a parole violation to Kilby Correctional Facility (Kilby) on October 31, 2013, his medications from his primary care doctor, orthopedic specialist, pain management specialist, and psychiatrist were all turned over to the Kilby nursing staff. (Id. at 10). The next day, several nurses told him that ADOC's policy was not to dispense those types of medications. (Id. at 11). One nurse said that he would be scheduled to see the doctor due to his "condition" and the pain medication that arrived with him. (Id.).

On December 14, 2013, a sergeant at Kilby forced Cameron to use the chow hall's regular entrance for inmates, instead of

2

letting him use the entrance for handicapped inmates; he fell and injured himself when his crutches "flew out from under [him]" due to food and liquids on the floor. (Id.). An officer picked him up, helped him to a table, and ordered an inmate to take him to the infirmary and to tell the nurses that an officer ordered him to go to the infirmary. (Id. at 11-12). The nurses conferred and called the doctor, who ordered x-rays, which she would review, to be taken on Monday or Tuesday, and that he be given Motrin. (Id. at 12). He was informed of this and was given a Motrin. (Id.).

Cameron claims that he never saw a doctor while at Kilby, even after his fall in which he "totally dislocated [his] right hip replacement socket (acetabular cup)" and complained of worsening pain. (Id. at 11, 12). He filed a medical grievance about these concerns, and was transferred a week later on January 14, 2014 to Fountain Correctional Facility (Fountain). (Id. at 11, 13).

After he filed several sick call slips, medical grievances, and complaints at Fountain, Cameron was finally seen by an institutional doctor in March 2014. (Id. at 13). The doctor reviewed the x-ray report, and told Cameron that, even without a comparison, he saw damage and would seek approval to have Cameron examined by an orthopedic specialist. (Id.). Between

March 24 and 28, 2014, Cameron was seen by Dr. Corbett in Bay Minette. (Id.). Dr. Corbett took additional x-rays and informed Cameron that even though he is an orthopedic surgeon, Cameron's situation was too complicated for him. (Id.). He advised Cameron that he would try to connect Cameron with Dr. Sudakar Madanagopal (hereinafter "Dr. Su") at the University of South Alabama Medical Center because Dr. Su had the knowledge and skills to handle the situation. (Id.).

On August 28, 2014, Dr. Su performed Cameron's hip surgery. (Id. at 14, 16). According to Cameron, the surgery's operative report, which he attached to his complaint, reads as follows: "This shows that the hip socket cup (acetabular cup) had not only been dislocated, but had worked its way (migrated) down and was wedged behind the metal hip joint shaft. The damage was so severe, the surgeon had to make a new hip socket placement spot higher up than where it should have been." (Id. at 17, 19-21 (exhibits 1-3)). Cameron further maintains that "the acetabular cup being ripped from [his] pelvis, and the metal ball and shaft hip joint being forced to wallow around against [his] pelvis with no cup or socket to protect the bone or pelvis[] did irreversible damage," which indicates how much ADOC and Corizon care about handicapped or special-needs inmates. (Id. at 16).

Cameron charges that he had to hobble around for eight

months in severe pain, and during the initial three months, he did not see a doctor. (Id. at 14). Then, it took ADOC and Corizon from March 24-28, 2014 to August 28, 2014 to provide the necessary surgery. (Id.). He maintains that this treatment is cruel and unusual punishment, torture, and deliberate indifference to a serious medical need. (Id.).

To support these conclusions about the treatment he received, Cameron provides other examples of allegedly deficient medical care he has received while in prison. According to Cameron, in 1997, he went four and half months with an untreated broken femur, which became infected and caused him to lose his left hip, part of his left femur, and almost his life. (Id.). In 2008, he was forced to settle his lawsuit based on that incident because the medical providers falsified his medical records. (Id.). An example of said falsification, Cameron maintains, is found in the jacket of his medical records which contains "codes" like "no distress noted," "does not appear to be in pain," and "drug seeking behavior," and by using these terms, they could justify doing nothing even though he had broken the largest bone in his body. (Id. at 15). He deduces that "it is illogical to think that they will treat someone like this and keep accurate records." (Id.).

Then, during the weekend of July 4, 2015, he experienced

5

chills and sweats. (Id. at 15). That weekend, he reported this to the nurse at pill call who pointed "something" at him and said that he did not have a fever. (Id.). On July 14, 2015, he began to urinate blood continuously. (Id.). He took a jar of it to the infirmary, where a determination was made that some blood was in the sample. (Id.). On July 20, 2015, an ultrasound of his kidneys and bladder was performed. (Id.). For the next three weeks, he continued to pass blood, which suddenly stopped, and then after three days, he was given seven days of antibiotics. (Id.). The ultrasound had shown cysts on his kidneys. (Id.). This was extent of his treatment and their concern. (Id.).

Moreover, Cameron relates that "for over a year" it has been known that his right knee replacement is coming apart. (Id. at 15-16). Dr. Su wanted to replace the knee, but ADOC and Corizon refused and sent him to someone who recommended that a knee brace be tried. (Id. at 16). His knee replacement is thirty-two years old, has been in as many falls as his hip, and has a part that is trying to work its way through his skin. (Id.).

Furthermore, Cameron complains that in his condition he is not provided an egg-crate mattress but is forced to sleep on a steel bunk with a thin mattress, which he maintains is a form of

torture and punishment.  (Id. at 16).  When he asked the medical staff at Kilby and Fountain about an egg-crate mattress or a hospital mattress, he was told that ADOC stopped them from doing that.  (Id.).  When he asked an ADOC official at Kilby about one of these mattresses, he was told that he could not have one because if he had not done what he did to be incarcerated, he would not need one, which he contends is the prevailing attitude shared by ADOC and medical personnel.  (Id.).

For relief, Cameron requests $500,000.00 for his pain and suffering; $100,000.00 in compensatory damages; $900,000.00 in punitive damages; a decision on his state-law claims; an injunction from being to transferred to Hamilton A & I; and an order improving the conditions and treatment.  (Id. at 8).

### B. Proceedings.

Cameron's Complaint has been served upon Thomas and Corizon and they have filed their Special Report (Doc. 16, p. 51), Answer (Doc. 17, p. 744), and Court-ordered Supplemental Special Report (Doc. 19, p. 751).  Upon review of these documents, the Middle District court ordered Cameron to respond, by April 19, 2016, to Defendants' assertions that his complaint is due to be dismissed for failure to exhaust administrative remedies and for failure to establish a violation of his constitutional rights.  (Doc. 20, p. 767).  Cameron was warned that his failure to

7

respond or to file a response that complied with the court's directives would result in his action being recommended for dismissal and any of his claims that are addressed by the written report to which he does not respond would be treated as abandoned. (Id., pp. 768-69). Cameron was also advised that in the future, the court may treat Defendants' report and his response as a dispositive motion and a response. (Id., p. 769). After denying Cameron's Motion for Appointment of Counsel (Doc. 24, p. 801), and granting his Motion for Extension of Time to File a Response to Defendants' Report (Doc. 25, p. 802), the court recommended the transfer of his action to this Court because the bulk of his Complaint concerns the medical treatment Cameron received at the Fountain facility, which is located in this district. (Doc. 26, p. 803). Cameron objected and claimed that his action must be filed in Montgomery County according to Section 6-3-9 of the Alabama Code, and that he did "not want to change horses in the middle of the stream[] so to speak." (Doc. 26, pp. 805-06). Notwithstanding his objection, the action was transferred to this Court on May 10, 2016. (Doc. 28, p. 809).

Since the transfer, Cameron filed his Response/Affidavit to Defendants' Special Report and Supplemental Special Report and Defenses, as ordered. (Docs. 35, 36, 37). Then, two months or so later, Cameron filed the instant Motion for Leave to Amend

and the Amended Complaint. (Doc. 38). Because the Amended Complaint was not on the Court's complaint form, he was ordered to re-file his amended complaint on the form, which he did. (Docs. 41, 42).

**C. The Amended Complaint.** (Doc. 42).

Although Cameron filed his Amended Complaint on the Court's form for prisoner complaints under § 1983, he did not respond to all of the form's questions or follow its format. Rather, he relies chiefly on his attachment to the complaint form. In it, he names as Defendants, Thomas, Corizon, CRNP Marianne Baker, Dr. Sangetta Doshi, Health Services Administrator Katherine Gibson, Dr. Hugh Hood, and Dr. Karen Stone. (Id. at 8-9). He does not provide the current addresses for these new Defendants, but instead refers to the address for Thomas's and Corizon's counsel. Some of these new Defendants appear, from information in the file, to be located in Montgomery.

Cameron begins the Amended Complaint by stating that he wants to incorporate into his original Complaint Defendants' "claims, charges, issues, federal acts, law and constitutional violations. . . [; his] Response/Affidavit to Defendants' Special Report and Supplemental Special Report and Defenses; and [his] Affidavit in Support of His Motion for Appointment of Counsel; and [the] Amended [Complaint]," as he does not want to

lose or abandon his initial claims. (Id. at 10-11). He claims that the additional Defendants and claims will not prejudice Defendants and are justified by the aforementioned pleadings and evidence. (Id. at 11). Cameron alleges that ADOC, Corizon, and its medical staff have a policy, custom, and scheme to deny and delay needed medical care which is carried out by "covering up" through the submission of false affidavits and falsified medical records. (Id.). And, Cameron alleges that the Defendants have conspired to use this policy, custom, and scheme against inmates particularly those inmates with expensive, or potentially expensive, medical care needs, such as himself. (Id.).

Cameron claims that he has stated in his pleadings from the beginning that he is handicapped, and it is implied in his original Complaint that he is bringing claims under the Rehabilitation Act of 1973 and the Americans with Disabilities Act, but he did not have access to their cites when filed his initial Complaint. (Id. at 12).

Cameron alleges that he had hip replacement surgery on August 28, 2014, and knee replacement surgery on June 20, 2016, and did not receive any of the recommended physical therapy or rehabilitation after either surgery. (Id.). After the hip replacement surgery, he was sent to a bare steel bunk in population, which he sat on all night until he received a mat

around noon the following day.  (Id. at 13).  Then, after his knee replacement surgery, he was sent to population to a steel bunk without a mat, but he received mat around midnight.  (Id.).

With respect to his knee, he complained to the medical staff about "this."  (Id.).  When he was released to population, his knee had an open wound.  (Id.).  Because the areas are not sanitized or disinfected, even though staph and MRSA cases are present at the prison, his wound became infected with three different strains of bacteria based on a culture taken July 29, 2016.  (Id. at 14).  According to Cameron, the medical staff knew the results on August 5, 2016, and that he had an urgent, dangerous, limb threatening, and potentially life-threatening problem.  (Id. at 13).  Nonetheless, he was not seen by a free-world doctor until August 25, 2016.  (Id.).  Previously, Cameron had been through this with ADOC's medical staff in 1997. It cost him his left hip and a large portion of his left femur when he was forced, for over four months, to live with a broken femur and a twisted hip replacement joint, which, due to the delay, became infected with nine strains of bacteria. He almost died as a result.  (Id. at 13-14).

Not only did the medical staff allow him to go twenty days, after learning of the infection in his knee, the medical staff attempted to interfere with the care and treatment of his knee's

11

infection by a free-world doctor. (Id.). The transportation personnel told Cameron they were instructed to return him from Mobile Infirmary to Fountain after the doctor saw him, no matter what. (Id.). Upon arrival at Mobile Infirmary, Dr. Xing told Cameron that Fountain's medical staff had been calling with instructions to send him back that same day. (Id.). Notwithstanding, Cameron woke up in a hospital room due to a lot of phone calls by Dr. Xing. (Id.).

Prior to being treated at Mobile Infirmary, Cameron was forced to walk a long way on his knee to pill call, where he had to stand in a long line in the elements, as no seating was provided. (Id. at 14-15). And, he had to sleep on a steel bunk, with a mat less than two inches thick, in a disease-infected dorm. (Id. at 15). Cameron states that "[t]his is a form of torture, for someone in [his] medical condition and handicap." (Id.).

In addition, from June 17 to 20, 2016, just prior to the surgery, he was placed in segregation for a "dirty urine" even though he told Lieutenant Pacheo that Lieutenant Gray and Captain Bishop told him it was an error and sent him back to his dorm. (Id.). His "dirty urine" was the result of a urine sample taken while he was taking two Tylenol #3 every six hours. (Id. at 16). He told Officer Brown and Lieutenant Pacheo about

12

this when the sample was taken, and Pacheo said medication would be marked on the form. (Id.). When Cameron was released from segregation, Lieutenant Gray said that he told Lieutenant Pacheo that the report was bogus and quashed it and that Cameron had been sent back to his dorm. (Id.).

According to Cameron, his segregation cell was hot, filthy, and roach-infested. It was a one-man cell that was shared with another inmate, and was not handicapped-equipped. (Id.). During his segregation stay, Cameron did not receive pain medication, a disciplinary report, or a toxicology report. (Id.).

For relief, Cameron wants all of the requested relief in his original complaint and any another relief the Court deems appropriate. (Id. at 17).

## II. Analysis.

### A. Applicable Law.

Rule 15(a) of the Federal Rules of Civil Procedure governs amending a complaint. In the posture of this action, with an answer having been filed on March 10, 2016 (Doc. 17), and with almost ten and half months having passed prior to the Amended Complaint's filing on January 30, 2017 (Doc. 42), Rule 15(a)(2) requires the opposing party's written consent or leave of court before a complaint can be amended. FED.R.CIV.P. 15(a)(2). The

court's leave, however, should be freely given when justice requires, (id.), except in the presence of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment[.]" McKinley v. Kaplan, 177 F.3d 1253, 1258 (11th Cir. 1999) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). The law of this Circuit is clear that "a district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile." Hall v. United Ins. Co. of America, 367 F.3d 1255, 1263 (11th Cir. 2004). "When a district court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 822 (11th Cir. 1999).

Similar to the futility considerations is 28 U.S.C. § 1915A's requirement that provides for the screening of and dismissal of an amended complaint filed by a prisoner against a government official regardless of the payment of the fee. 28 U.S.C. § 1915A (b) ("the court shall . . . dismiss the complaint, or any portion of the complaint, if the compliant – (1) is frivolous, malicious, or fails to state a claim upon

which relief may be granted . . .").

**B. Amended Complaint Violates Rule 8(a)(2).**

In examining Cameron's Amended Complaint, the Court's initial consideration is the manner in which Cameron pled the Amended Complaint. He states that he wants to incorporate, among other things, his response/affidavit to Defendants' Special Report and Supplemental Special Report and Defenses, his Affidavit in Support of his Motion for Appointment of Counsel, and his Amended Complaint into the original Complaint, without losing the initial Defendants and his claims. (Doc. 42 at 10). Typically, the law requires that the amended complaint include all of the original claims, as it replaces the prior complaint, which is deemed abandoned. Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006). Inasmuch as Cameron's claims are not in one document, the Amended Complaint is due to be dismissed because it is not a short and plain statement of his claims. See FED.R.CIV.P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . .(2) a short and plain statement of the claim showing that the pleader is entitled to relief. . . .).

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" Weiland v. Palm Beach Cty. Sheriff's Office, 792

F.3d 1313, 1320 (11th Cir. 2015). The Weiland court, based on

its review of decisions issued over the past thirty years,

> Identified four rough types or categories of
> shotgun pleadings. The most common type —
> by a long shot — is a complaint containing
> multiple counts where each count adopts the
> allegations of all preceding counts, causing
> each successive count to carry all that came
> before and the last count to be a
> combination of the entire complaint. The
> next most common type, at least as far as
> our published opinions on the subject
> reflect, is a complaint that does not commit
> the mortal sin of re-alleging all preceding
> counts but is guilty of the venial sin of
> being replete with conclusory, vague, and
> immaterial facts not obviously connected to
> any particular cause of action. The third
> type of shotgun pleading is one that commits
> the sin of not separating into a different
> count each cause of action or claim for
> relief. Fourth, and finally, there is the
> relatively rare sin of asserting multiple
> claims against multiple defendants without
> specifying which of the defendants are
> responsible for which acts or omissions, or
> which of the defendants the claim is brought
> against. The unifying characteristic of all
> types of shotgun pleadings is that they fail
> to one degree or another, and in one way or
> another, to give the defendants adequate
> notice of the claims against them and the
> grounds upon which each claim rests. The
> unifying characteristic of all types of
> shotgun pleadings is that they fail to one
> degree or another, and in one way or
> another, to give the defendants adequate
> notice of the claims against them and the
> grounds upon which each claim rests.

Id. at 1321-23. Each of the four categories of shotgun

pleadings described by the Weiland court is present in Cameron's

Amended Complaint.

Cameron's request to include information contained in several documents into one pleading is akin the <u>Weiland</u> court's first category that describes a pleading that re-alleges all preceding counts with the last count containing the entire preceding counts and allegations as a shotgun pleading. <u>Id.</u> at 1321. Cameron's request to include several documents into his original Complaint would result in a cobbled-together pleading that would be repetitive, cause confusion, and deprive a defendant of fair notice of the particular claim lodged against him. Thus, this new pleading proposed by Cameron would create the same issues that are produced by the style of pleading depicted in the first category.

<u>Weiland</u>'s second category explains that a shotgun pleading is one containing vague and conclusory allegations that are not connected to a cause of action. <u>Id.</u> at 1332. Present in Cameron's Amended Complaint are some allegations of this character, [2] but the Amended Complaint is not completely rife

---

[2] Vague and conclusory allegations do not satisfy Fed.R.Civ.P. 8(a)(2). <u>Fullman v. Graddick</u>, 739 F.2d 553, 556-57 (11th Cir. 1984) (finding that conclusory allegations of a conspiracy are subject to dismissal); <u>see Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 1964, 1974, 167 L.Ed.2d 929 (2007) (to state a claim a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," "nudg[ing] . . . claims across the line from conceivable to plausible" and containing more than "labels and conclusions, and

with them.  See, e.g., Doc. 42 at 11.

The third category of a shotgun complaint described by the Weiland court is one that does not separate "into a different count each cause of action or claim for relief."  Id. at 1323. That is, a complaint is required to be "divided into separate paragraphs with each describing a 'single set of circumstances,' as required by the rules."  Gilbert v. Daniels, 624 F. App'x 716, 718 (11th Cir. 2015) (unpublished) [3] (citing FED.R.CIV.P. 10(b)).  Cameron's Amended Complaint does not satisfy this requirement; however, if he had properly completed the form complaint, his allegations would have gone a long way to meeting this requirement.  Each Defendant is entitled to notice, and would have been informed of the specific facts on which Cameron's claims against him or her is based.

The last category described by the Weiland court is mentioned as being rare.  However, the matter it addresses is the greatest failing of Cameron's Amended Complaint.  In this

---

a formulaic recitation of the elements"); Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[3] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11TH CIR. R. 36-2 (2005).

last category, Weiland identifies a complaint as a shotgun pleading if "it assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." 792 F.3d at 1323. The pleading of Cameron's Amended Complaint falls into this category because Cameron lists persons as Defendants but does not mention them in his Amended Complaint's description of his claims. For example, the new Defendants, CRNP Marianne Baker, Dr. Sangetta Doshi, HSA Katherine Gibson, Dr. Hugh Hood, and Dr. Karen Stone, and prior Defendant Thomas are not mentioned in the description of his claims in the Amended Complaint. On the other hand, DOC, Corizon, Corizon's medical staff, and "Defendants" are referenced in the description. And, most of the claims are directed to the prison's "medical staff," which is not an entity capable of being sued in a § 1983 action. Stallworth v. Monroe Cty. Hosp., 2012 WL 2921838, at *3, 2012 U.S. Dist. LEXIS 98849, at *7-8 (S.D. Ala. 2012) (unpublished) (collecting cases); see also Mercer v. Broward Hosp. Dist., 270 F. App'x 789, 791 (11th Cir. 2008) (unpublished)(finding the entity that operated the medical center could not be held liable in a § 1983 action under the theory of respondeat superior for the medical personnel's actions). Thus, the pleading of the

Amended Complaint comes within the fourth category of shotgun pleadings. See Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (a complaint that "is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the . . . defendants charged, though geographic and temporal realities make plain that all of the defendants could not have participated in every act complained of" is a shotgun complaint).

Moreover, by failing to refer to Baker, Doshi, Gibson, Stone, and Thomas, Cameron has failed to allege the required causal connection between each Defendant and a claim for a violation of his constitutional rights. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (to state a § 1983 claim a plaintiff must establish a causal connection between a defendant's actions, orders, customs, or policies and a deprivation of his constitutional rights). Thus, the Amended Complaint has failed to state a claim against Baker, Doshi, Gibson, Stone, and Thomas, which is a ground for dismissal under 28 U.S.C. § 1915A, and renders the Amended Complaint futile as to them. Id.

**C. The Amended Complaint Arises Out of a Different Occurrence.**

Furthermore, an amended complaint is allowed when the claim "arises out of the conduct, transaction, or occurrence set out –

or attempted to be set out – in the original pleading."
FED.R.CIV.P. 15(c)(1)(B). In the present action, in the original
Complaint brought pursuant to §§ 1983 and 1988, Cameron chiefly
complains about an injury to his right hip and the medical
treatment, or lack thereof, for it. He identifies December 14,
2013 as the date when the violation occurred (his fall) and
states that "it continues and worsens through present," which is
December 8, 2015, when he filed the complaint. (Doc. 1, p. 6).
And, the surgery to repair his right hip occurred on August 28,
2014. (Id., p. 14).

Cameron identifies the following claims in his original
Complaint: (1) Denying access "to a doctor" and "to needed
serious medical care, treatment and surgery," "to an orthopedic
specialist," and "confiscating and refusing to give medication
prescribed by free-world orthopedic pain specialist and
psychiatrist"; (2)"Deliberate indifference to serious medical
needs, cruel and unusual punishment; deliberate indifference to
pain, suffering and needs of inmate with special medical
conditions and needs and treatments and to the handicap"; and
(3) "Torturous, needless, and unjustified delay of eight (8)
months in needed surgery to repaid a painful totally dislocated
hip replacement socket cup (acetabularcup revision) and
extensive damage and torturous pain caused by the delay and

21

forced to hobble around on it for 8 months." (Doc. 1, p. 6-7).

On the other hand, in his Amended Complaint filed on January 30, 2017 (Doc. 42), Cameron's chief concern is the delay in treatment for an infection following knee-replacement surgery on his right knee on June 20, 2016. (Id. at 12). On July 29, 2016, a culture was made of the infection, which showed three different types of bacteria, which he contends Defendants knew on August 5, 2016, yet waited until August 25, 2016 to render treatment when he was taken to Mobile Infirmary. (Id. at 13-14).

The other allegations in the Complaint and Amended Complaint are mostly pled to show a pattern of medical treatment that is replicated in the treatment Cameron received for his injured right hip and for his knee's post-operative infection. And, there are other pleading problems in the Complaint and Amended Complaint, some of which have been previously noted.

Because Cameron's hip injury occurred on December 14, 2013 and the surgery to repair his hip took place on August 28, 2014, his claims concerning his knee's infection that arose after surgery on June 20, 2016 are not related to his claims based on the medical care he received for his hip. The claims related to his infection after his knee surgery did not rise out of the same "conduct, transaction, or occurrence" as required by Rule 15(c)(1)(B). Rather, Cameron's claims concerning his knee's

22

post-operative infection should be filed in another action as the two-year statute of limitations for filing a § 1983 action in Alabama has not expired.  Lufkin v. McCallum, 956 F.2d 1104, 1105, 1108 n.2 (11th Cir.), cert. denied, 506 U.S. 917 (1992).

In addition, the Amended Complaint contains a claim based on his confinement to segregation, which occurred immediately before his knee-replacement surgery.  (Doc. 42 at 15-16). Cameron alleges that the disciplinary was false because his "dirty urine" was the result of taking pain medication.  (Id. at 15).  Claims challenging the legality of this segregation confinement do not arise out of the "conduct, transaction, or occurrence" related to his claims based on his hip, as required by Rule 15(c)(1)(B), nor do they appear to arise out of the conduct connected to his knee infection.  Consequently, the segregation claims also should be brought in a separate action.

**D.  Amended Complaint's Allowance Would Cause Prejudice.**

Beyond the substantive aspect of the matters in Cameron's Complaint and Amended Complaint, the proceedings in this action reflect that at the time this action was transferred to this Court on May 10, 2016 (Doc. 28), the action was in the posture to be converted to a motion for summary judgment without further notice, of which Cameron was advised.  (Doc. 20, pp. 767-771). The Complaint was filed on December 8, 2015, and had been

23

responded to by Defendants with their Special Report, Answer, and Supplemental Special Report in March, 2016. (Docs. 16, 17, 19). On March 30, 2016, Cameron was ordered to file his response to these pleadings by April 19, 2016, and was informed of the consequences of his failure to respond, i.e., the dismissal of his action or claims to which he did not respond. (Doc. 20, pp. 767-771). On August 3, 2016, Cameron filed his responses to these pleadings. (Docs. 35-37). Thus, to delay the resolution of the claims in the original Complaint while the claims in the Amended Complaint are developed and new Defendants are added to the action and to a different set of facts is prejudicial to Defendants Thomas and Corizon. Nolin v. Douglas Cty., 903 F.2d 1546, 1551 (11th Cir. 1990) (affirmed denial of an amendment that would have re-opened the pretrial process and delayed the trial), rev'd on other grounds McKinney v. Pate, 20 F.3d 1550, 1558 (11th Cir. 1994); Barrett v. Independent Order of Foresters, 625 F.2d 73, 75 (5th Cir. 1980) (denial of motion to amend was not an abuse of discretion as the motion to amend was filed almost ten months after the original complaint and contained matters that could have been raised initially);[4] Stein

---

[4] The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

v. Disciplinary Bd. of the Supreme Ct. of New Mexico, 2006 WL 4079022, at *1, 2006 U.S. Dist. LEXIS 95378, at *1 (D. N.M 2006) (a motion for leave to amend should not be used to circumvent summary judgment or as a tool to thwart the speedy and efficient resolution of the case); Lavender v. Kearney, 206 F. App'x 860, 865 (11th Cir. 2006) (unpublished) (to allow "a set of facts different from those underlying the claim against [the original defendant] . . . would have unduly prejudiced [the original defendant]").

Therefore, the Court finds that Defendants Thomas and Corizon would be prejudiced if Cameron was permitted to add the proposed amendment at this point in the litigation.

## III.  Conclusion.

Based upon the foregoing reasons, it is recommended that Cameron's Amended Complaint (Doc. 42) be denied.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. Gen.LR 72(c). The parties should note that under Eleventh Circuit Rule 3-1,

"[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **25th** day of **May, 2017.**

_____/S/SONJA F. BIVINS_____
**UNITED STATES MAGISTRATE JUDGE**