IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHNNY L. CAMERON,            *
                             *
            Plaintiff,        *
                             *
v.                           * CIVIL ACTION NO. 16-00230-WS-B
                             *
KIM THOMAS, *et al.*,          *
                             *
            Defendants.       *

### REPORT AND RECOMMENDATION

Plaintiff Johnny L. Cameron, a former prison inmate proceeding *pro se*, filed his complaint under 42 U.S.C. §§ 1983 and 1988. (Doc. 29 at 5-21). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants' Motion for Summary Judgment. After careful review of the pleadings, and for the reasons set out below, it is ordered that Defendants' Motion for Summary Judgment be **granted** in favor of Defendants and that the claims asserted against Defendants Kim Thomas and Corizon, Inc., be **dismissed** with prejudice.

I.   **Summary of Allegations.**

Plaintiff brings this action against former ADOC Commissioner Kim Thomas ("Thomas") and Corizon, Inc. ("Corizon") for inadequate medical care (including denied or delayed access to doctors, medications, and surgeries) while within the custody

of the Alabama Department of Corrections ("ADOC"). According to Cameron, he suffers from diabetes, high blood pressure, and has had bilateral knee and hip replacements in the past. On October 31, 2003, he was transferred to Kilby Correctional Facility ("Kilby") from the county jail. (Doc. 29 at 11). During the intake procedure at Kilby, Cameron was informed that the prison would not administer the prescribed medications he brought with him from his free world primary care doctor, orthopedic specialist, pain management specialist, and psychiatrist. (Id.). The nursing staff told him that it was ADOC's policy not to dispense those types of medications, namely the prescription pain medications. (Id.). However, he was informed by one nurse that he would be placed on a list to see a doctor to discuss his medical conditions and need for medications. (Id.).

On December 14, 2013, while incarcerated at Kilby, Cameron, who walks with the assistance of forearm crutches, alleges he was forced by a sergeant to enter the chow hall through the main entrance, rather than the handicapped entrance. (Id. at 11). While in the chow hall, Cameron fell to the floor when his crutches slipped out from under him due to liquids on the floor. (Id. at 11). An officer immediately helped Cameron off the ground and had another inmate escort him to the infirmary to be examined. (Id. at 11-12). After waiting approximately one

hour, the nursing staff screened Cameron and contacted the institutional doctor by telephone. (Id. at 12). The doctor prescribed Motrin for Cameron's pain and ordered an x-ray scan to be taken on the following Monday (two days later). (Id.). Cameron was advised that he would see the doctor after the x-ray was reviewed. (Id.). Diagnostic scans were taken of Cameron's hip on December 16, 2013, but Cameron was not called in to be examined by the doctor. (Id. at 12, 190).

On January 6, 2014, Cameron filed a medical grievance at Kilby on the ground that he had yet to be seen by a doctor at Kilby for his chronic pain and his December 14, 2013 fall. (Id. at 12, 760). Cameron alleges that before receiving a response to his grievance, he was transferred to Fountain Correctional Facility ("Fountain") on January 14, 2014.[1] (Id. at 760).

Cameron alleges that once he was incarcerated at Fountain, he filed numerous sick call requests, grievances, and medical complaints, but he was not examined by a doctor until March 2014. (Id. at 13). When Cameron saw the institutional doctor on March 12, 2013, the institutional doctor informed him that his medical jacket reflected that Cameron's December 2013 x-ray showed there might be "some damage" to his hip, but without prior scans for comparison, it was impossible to know the

---

[1] The record contains Camron's grievance and a response dated January 14, 2014. The response states "Transferred to Fountain Correctional Facility today." (Doc. 29 at 760).

extent. (Id. at 13). As a result, the doctor ordered new x-ray scans of Cameron's right hip. (Id. at 206). The new x-ray scans were compared to the prior x-ray scans. The new x-ray scans showed migration of the prosthesis into the right iliac bone. (Id.). Possible septic or aseptic loosening were also noted. (Id.). On March 20, 2014, the institutional doctor referred Cameron to an orthopedic specialist, Dr. Corbett. (Id. at 13, 208-10).

A week later, on March 27, 2014, Dr. Corbett opined that Cameron's right hip socket cup was out of place. (Id. at 13). He recommended joint replacement surgery, and referred Cameron to Dr. Sudakar Madanagopal at South Alabama Medical Center for surgery. (Id.). The surgical procedure to repair Cameron's dislocated acetabulum cup was performed by Dr. Madanagopal on August 28, 2014. (Id.). Cameron claims he suffered extreme pain during the months the surgery was delayed. (Id.). He also contends that that this delay in treatment constituted "cruel and unusual punishment," "torture," and "deliberate indifference to a serious medical need." (Id. at 14).

Additionally, Cameron alleges he was denied or received delayed medical treatment for kidney cysts after he reported having chills and sweats the weekend of July 4, 2015. (Id. at 15). According to Cameron, he informed a nurse of his symptoms at pill call and she "pointed something at [him] from behind a

locked grill gate and said, 'you don't have a temp.'"   (Id.).
Cameron claims subsequent thereto, on July 14 and 15, 2015, he
began to urinate blood.   (Id.).   He took a collected sample of
the urine to the infirmary where it tested positive for blood.
(Id.).   However, the nurse told him to "go back down the hall."
(Id.).   A renal ultrasound was conducted on July 20, 2015 and
revealed bilateral renal cysts. (Id.).   Cameron alleges that he
was only prescribed a course of antibiotic treatment, and that
after urinating blood for three weeks, the bleeding
spontaneously stopped.   (Id.).

In addition, Cameron claims that his right knee replacement
is failing, that Defendants have been aware that he needs a
surgical repair for a year, and that they have refused to
provide him with the surgery recommended by the orthopedic
specialist.   (Id. at 15-16).   He claims that instead of
following the specialist's recommendation, ADOC and Corizon sent
him to someone else who recommended that he try a knee brace.
(Id. at 16).

Lastly, Cameron alleges he was forced to sleep on a steel
bunk with a thin mat and was denied an egg crate mattress or
hospital mattress while incarcerated.   (Id.). Cameron contends
that when he asked the medical staff at Kilby and Fountain about
an egg-crate mattress or a hospital mattress, he was told that
ADOC stopped them from doing that.   (Id.). He also asserts that

an ADOC official at Kilby said, in response to his mattress request, that he could not have one because if he had not done what he did to be incarcerated, he would not need one. Cameron maintains that this is the prevailing attitude shared by ADOC and medical personnel, and that given the condition of his hip, such treatment amounts to cruel and unusual punishment.[2] (Id.).

Cameron is suing Defendants in their official and individual capacities, is seeking seeks monetary damages for the alleged Eighth Amendment violations,[3] and is requesting a trial by jury. (Id. at 8).

## II.  Procedural History.

Cameron filed this action in December 2015 in the United States District Court for the Middle District of Alabama.  (Doc.

---

[2] According to Cameron, during a previous imprisonment in 1997, he went four and one-half months with an untreated broken femur. (Id. at 14).  It became infected and caused him to lose his left hip, part of his left femur, and almost his life. (Id.).  Cameron contends that he was forced to settle his lawsuit based on that incident in 2008 because the medical providers falsified his medical records.  (Id.).  As an example of said falsification, Cameron maintains the jacket of his medical records contains "codes" like "no distress noted," "does not appear to be in pain," and "drug seeking behavior," and by using these terms, the medical providers could justify doing nothing even though he had broken the largest bone in his body.  (Id. at 15).  He deduces that "it is illogical to think that they will treat someone like this and keep accurate records." (Id.).

[3] In addition to monetary damages, Cameron also requested that he "not be transferred to that racist prison Camp Hamilton A&I."  (Doc. 29 at 8).  The law is settled that a § 1983 action filed by a prisoner seeking injunctive relief becomes moot one he is transferred or released from the facility where the cause of action arose.  Cameron's filings (see docs. 45, 53) demonstrate that he is no longer incarcerated within the Alabama Department of Corrections system; thus, his claim for injunctive relief is moot.  Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988) (Plaintiff "was transferred to another facility shortly after his complaint was filed. . . . At that point, his claims for injunctive and declaratory relief relating to the conditions of his administrative segregation at the West Jefferson facility no longer presented a case or controversy.").

29 at 1).   After Defendants Thomas and Corizon filed their Answer, Special Report, and Supplemental Special Report (doc. 29 at 3), the Court concluded that because the bulk of Cameron's claims relate to medical treatment he received while incarcerated at Fountain, which is located within the Southern District of Alabama, the case should be transferred to this District.   Notwithstanding objections by Cameron, the case was to the Southern District of Alabama on May 10, 2016. (Doc. 29 at 4, 803-811).

Cameron sought to amend his complaint to add additional Defendants, but his request was denied because he failed to allege a causal connection between the individuals he sought to add and the alleged constitutional violations. The Court also determined that an amendment at this juncture would be prejudicial. (Doc. 47, 49, 50).   Thus, the operative complaint for this action is the original complaint filed in the Middle District of Alabama, naming Defendants Corizon, Inc., and Kim Thomas.

The Court entered an order notifying the parties that Defendants' Answer and Special Reports were being converted into a motion for summary judgment, and giving them an opportunity to file briefs and materials in support or opposition. (Doc. 51). Cameron filed responses opposing summary judgment (Docs. 35,

54).   The  motion  for  summary  judgment  is  now  ripe  for
consideration.

### III. Summary Judgment Standard.

Summary  Judgment  is  proper  "if  the  movant  shows  that  there
is  no  genuine  dispute  as  to  any  material  fact  and  that  the
movant  is  entitled  to  judgment  as  a  matter  of  law."   Fed.  R.
Civ.  P.  56(a);  see  Anderson  v.  Liberty  Lobby,  Inc.,  477  U.S.
242,  247-48,  106  S.  Ct.  2505,  2510,  91  L.  Ed.  2d  202  (1986);  see
also  Celotex  Corp.  v.  Catrett,  477  U.S.  317,  322,  106  S.  Ct.
2548,  91  L.  Ed.  2d  265  (1986);  Garczynski  v.  Bradshaw,  573  F.3d
1158,  1165  (2009)  ("[S]ummary  judgment  is  appropriate  even  if
'some  alleged  factual  dispute'  between  the  parties  remains,  so
long  as  there  is  'no  genuine  issue  of  material  fact.'"  (emphasis
omitted)).

The  party  asking  for  summary  judgment  "always  bears  the
initial  responsibility  of  informing  the  district  court  of  the
basis  for  its  motion,  and  identifying  those  portions  of  the
'pleadings,  depositions,  answers  to  interrogatories,  and
admissions  on  file,  together  with  the  affidavits,  if  any,'  which
it  believes  demonstrate  the  absence  of  a  genuine  issue  of
material  fact."   Celotex,  477  U.S.  at  323.   The  movant  can  meet
this  burden  by  presenting  evidence  showing  there  is  no  dispute
of  material  fact,  or  by  showing,  or  pointing  out  to,  the
district  court  that  the  nonmoving  party  has  failed  to  present

evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More

importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record— such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[4]

## IV. Discussion.

In his complaint, Cameron sets forth three grounds of alleged constitutional violations by Defendants Corizon and Thomas:

> Ground One:      Denying access to see a doctor, delaying access to needed serious medical care, treatment and surgery, denying access to an orthopedic specialist, confiscating and refusing to give medications prescribed by free-world orthopedic pain specialist and psychiatrist.

> Ground Two:      Deliberate indifference to serious medical needs, cruel and unusual punishment, deliberate indifference to pain and suffering and needs of inmates with special conditions and needs and treatments, and to the handicap.

---

[4] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

> Ground Three:     Torturous,      needless,      and
> unjustified delay of eight (8) months, in needed
> surgery to repair a painful totally dislocated hip
> replacement socket cup (acetabular cup revision) and
> extensive damage and torturous pain caused by the
> delay and forced to hobble around on it for 8 months.

(Doc. 29 at 6-7).   For purposes of clarity, Cameron's claims have been regrouped based on the facts, allegations, and defenses contained in the parties' pleadings.   The Court will now discuss each in turn.

### A.   The PLRA Bars Plaintiff's Claim Against Defendants Because Plaintiff Failed to Exhaust His Administrative Remedies.

In their Motion for Summary Judgment, Defendants argue that Cameron is barred from bringing this action due to his failure to exhaust administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA").   The PLRA states that:

> No action shall be brought with respect to prison
> conditions under section 1983 of this title, or any
> other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such
> administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a).   "Section 1997e(a) is intended to force inmates to give authorities a chance to correct constitutional violations before resorting to federal suit and to prevent patently frivolous lawsuits." Horne v. Nevil, 2017 WL 9486058 at *4, 2017 U.S. Dist. LEXIS 44613 at *9 (S.D. Ga. March 7, 2017). "Congress has provided in §1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through

administrative remedies." Booth v. Churner, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001). Further, the exhaustion requirement of the PLRA "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002), and is required even if the available administrative remedies are futile or inadequate. Harris v. Garner, 190 F.3d 1279, 1285-86 (11th Cir. 2005).

Exhaustion of all available administrative remedies is a precondition to litigation and is mandatory. See Ross v. Blake, __ U.S. __, 136 S. Ct. 1850, 1853, 195 L. Ed. 2d 117, 120 (2016) ("That mandatory language means a court may not excuse a failure to exhaust, even to take "special circumstances" into account.); Woodford v. Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). The Supreme Court has noted that each prison sets its own administrative remedies, Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007), and that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford, 548 U.S. at 90-91. Thus, prisoners must

go beyond merely filing a grievance and are required by the PLRA's exhaustion requirement to "properly take each step within the [prison's] administrative process," including appealing denials of relief. Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005).

> In order to determine whether Plaintiff fully exhausted his available administrative remedies, the Court thus first examines and consider [sic] both the Defendants' and the Plaintiff's version of the facts, taking the Plaintiff's version of the facts as true. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). "If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* If the complaint is not subject to dismissal at the first step, then the court shall proceed to make specific findings in order to resolve disputed factual issues related to exhaustion. *Id.* The defendants bear the burden of pleading and proving that the plaintiff has failed to exhaust available administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

Shepard v. Fla. Dep't of Corr., 2017 U.S. Dist. LEXIS 53046 at *24-25 (S.D. Fla. Apr. 5, 2017).

The Supreme Court has specified three "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross, 136 S. Ct. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved

inmates." Id. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  Id.  Finally, a grievance process is rendered unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation."  Id. at 1860.  The law is also well settled that "the question of exhaustion under the PLRA [is] a 'threshold matter' that [the court must] address before considering the merits of the case."  Myles v. Miami-Dade Cnty. Corr. & Rehab. Dep't, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting Chandler v. Crosby, 379 F.3d 1278, 1286 (11th Cir. 2004)).

The Eleventh Circuit has set out a two-part test to determine whether or not a suit may be dismissed for failure to exhaust administrative remedies.  See Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008).  First, a court "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, take the plaintiff's version of the facts as true.  If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed."  Id. at 1082.  If the complaint is not subject to dismissal, then the court "proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion."  Id.

In the current action, Defendants have submitted that Corizon provides an administrative remedy for inmate complaints through a grievance procedure. Defendants explain this procedure as follows:

> The grievance process is initiated when an inmate submits a Medical Grievance form to [the Health Services Administrator (HSA)] through the institutional mail system. After reviewing Medical Grievance, [the HSA or her designee] then provide[s] a written response [to the grievance] within approximately ten (10) days of receipt of the Inmate Grievance. The written response to a Medical Grievance is included on the bottom portion of the same form containing an inmate's Inmate Grievance. Below the portion of the form designated for the "Response," the following notation appears:
>
> > IF YOU WISH TO APPEAL THIS REVIEW YOU MAY REQUEST A GRIEVANCE APPEAL FORM FROM THE HEALTH SERVICES ADMINISTRATOR. RETURN THE COMPLETED FORM TO THE ATTENTION OF THE HEALTH SERVICE ADMINISTRATOR. YOU MAY PLACE THE FORM IN THE SICK CALL REQUEST BOX OR GIVE IT TO THE SEGREGATION SICK CALL NURSE ON ROUNDS.
>
> As stated in the Medical Grievance forms, the second step of the grievance process involves the submission of a formal Grievance Appeal, at which time the inmate may be brought in for one-on-one communication with the medical staff, the Director of Nursing or [the Health Services Administrator]. A written response to a formal Grievance Appeal is provided within approximately five (5) days of receipt.
>
> Medical Grievance forms are available from the correctional officers at Fountain. Inmates are instructed to place completed Medical Grievance forms in the sick call boxes located throughout the facility. When received in the Health Care Unit, Medical Grievance forms are sent to the Health Services Administrator by the medical records clerk or administrative assistant. The Health Services

> Administrator reviews the grievances daily, provides a
> written response within approximately ten (10) days at
> the bottom of the form and returns a copy of the
> completed forms to the inmate. The Health Services
> Administrator encourages inmates who have complaints
> about the medical care they have sought or received at
> Fountain to utilize this grievance process.

(Doc. 29 at 91-92).

Defendants also provided copies of the grievances filed by

Cameron; thus, it is undisputed that Cameron was aware of the

grievance procedure and availed himself of it while imprisoned

at Kilby and Fountain.  A review of the record reveals that

Cameron submitted nine medical grievances during the relevant

time.  (Id. at 737-43, 760, 797).  A summary of each is as

follows:

> On January 6, 2014, while at Kilby, Cameron filed a
> grievance complaining that he had yet to see a doctor
> and that his hip pain was worsening. (Id. at 760).
>
> On January 24, 2014, while at Fountain, Cameron filed
> a grievance complaining that he had yet to see a
> doctor or receive his pain medication, Motrin.
> Additionally, Cameron vented at the nurse's advice to
> him that he could receive Motrin by signing up for
> sick call and paying a copay amount or by purchasing
> the Motrin from the canteen, where it would be
> cheaper. (Id. at 737).  The grievance was responded
> to timely and Cameron was informed that he had been
> scheduled to see the doctor for chronic care issues
> and explained the copay situation of the health care
> unit and the option to purchase certain items from the
> canteen or receive them through the health care unit.
> (Id.).
>
> On February 22, 2014, Cameron filed a grievance
> complaining that he did not receive his pain
> medication at pill call. (Id. at 738).  In a timely
> written response to the grievance, Cameron was advised

16

that his medical chart revealed he had been prescribed Naprosyn KOP (to be kept by him, not given at pill call). (Id.). Cameron was also advised that he could speak to the doctor during his next chronic care appointment, and that if the Naprosyn did not treat his pain, he should complete a sick call form and return to the health care unit for an evaluation. (Id.).

On May 15, 2014, Cameron filed a grievance complaining that he was informed at pill call that his pain medication expired. He asserted that this subjected him to needless pain and should have been avoided. (Id. at 739). In a timely written response, Cameron was advised that his pain medication is a narcotic and providers do not automatically refill narcotics. He was also advised that the prescription had been refilled. (Id.).

On November 6, 2014, Cameron filed a grievance complaining that after being released from the infirmary following his hip replacement surgery, there was an inmate in the bed to which he was assigned and the inmate did not leave until 6:30 p.m. He also complained that he was forced to sleep on a "hard steel bunk with no mattress", and that he fell after being accidently tripped by another inmate. (Id. at 740). In a timely written response, medical officials apologized for the incident and explained that the medical staff has no control over bed assignments and can only notify appropriate personnel. Cameron was also advised to return to the infirmary to be examined due to his fall. (Id.). Additionally, there is a notation that the responding nurse was forwarding the grievance to the shift supervisor. (Id.).

On March 6, 2015, Cameron filed a grievance complaining that his pain medication had expired and that he was denied his pain medication at pill call. (Id. at 741). He further complained that his right knee replacement was failing and causing him pain for which he needed medication. (Id.). In a written response dated the same day, Cameron was advised, "Please notify me if the nurse cannot resolve your concern related to pain management if orders expire. Thanks." (Id.).

On May 9, 2015, Cameron filed a grievance complaining that although he had been approved for knee replacement surgery, he needed pain medication until then and that he was again denied his pain medication at pill call due to an expired order. (Id. at 742). Cameron vented that this continued scenario should not keep happening. (Id.). In a timely written response, Cameron was advised that the doctor had been notified of the issue and his chart had been flagged for monthly review in attempt to cure the problem. (Id.).

On July 29, 2015, Cameron filed a grievance complaining that he had been urinating blood since July 14, 2015 and the only treatment he had received was an ultrasound. (Id.). In a timely written response, it was noted that a review of Cameron's medical file did not reveal any call requests since April 2015 and that there were no sick call requests regarding the renal issue. The medical file did reveal orders for an ultrasound and lab work. Cameron was scheduled to see the doctor for a follow up. (Id.).

On September 6, 2015, Cameron filed a grievance complaining that his pain medication was again denied at the 11:00 p.m. pill call because it was expired and the pill call nurse refused to call the doctor to sort out the situation. (Id. at 797). In a timely written response, Cameron was advised that his chart was "flagged to alert renewal, but [his] medication was changed and stop dates were different" but that it had been updated. (Id.). Cameron was also advised that his medication had to be approved by the regional medical director and there was a delay in that and that the medical staff would "continue to work to prevent any delay as able." (Id.).

A review of Cameron's submitted grievances shows that he not only knew about the administrative remedies available for medical complaints but utilized the process. The nine grievances state the same or similar complaints alleged in this action. However, it is undisputed that Cameron failed to

exhaust the available administrative remedies by his failure to file a single appeal to any grievance. This final step in the administrative procedure is detailed on every medical grievance form as shown in Defendants' Special Report. (Id. at 737-43, 760, 797).

In addition to failing to file an appeal, Cameron has failed to allege, let alone demonstrate, in any of his pleadings that administrative remedies were unavailable to him, that the process was too difficult to use, or that he was hindered in any way from filing grievances or appeals. In a response to an Order by U.S. Magistrate Judge Gray M. Borden of the Middle District of Alabama to address why his claims should not be dismissed for the failure to exhaust administrative remedies, Cameron did not allege that he filed or made any attempt to appeal any of his medical grievances per the administrative grievance procedure. (Doc. 29 at 767-71) Instead, Cameron asserted that there were at least seven missing grievance forms from his medical jacket and claims that these forms were never responded to or returned. (Id. at 779-80). In support of his assertion, Cameron submitted one of the "missing" grievance forms (dated September 6, 2015, see supra) that was not included in Defendants' special report. While Cameron is correct that it was not included in Defendants' submission, the document belies his claim that he received no response to his missing

grievances.   As noted *supra*, the specific grievance referenced by Cameron contains a written response from the medical staff. (Id. at 797).

In response to Defendants' Special Report, Cameron alleges that Defendants' submitted medical records are inaccurate and falsified, that Defendants "get rid" of grievances and sick call requests, and that Defendants encourage inmates to not file grievances by instructing them to "verbally tell any medical staff personnel if your condition does not improve or worsens, [and] Plaintiff now knows why, its so they can make no notations and deny that it ever happened." (Doc. 35 at 3, 27).  Cameron's response, however, is devoid of facts indicating that he filed or made any attempt to file an appeal to a single grievance. Likewise, in opposition to the instant motion for summary judgment, Cameron again does not allege let alone demonstrate that he filed or made any attempt to file an appeal to a grievance response. Further, he does not allege nor demonstrate that he was unable to file an appeal. (Doc. 54).

The Court thus concludes that, to the extent Cameron claims that administrative remedies were not available to him because of no response to his grievances or misplaced grievances, his argument is without merit.  The record confirms that Cameron knew of the medical grievance procedure and had access to the same. This is evidenced by the nine grievance forms that Cameron

completed during the relevant time period, and which are before the Court. The record is devoid of a single document (grievance form, sick call request, nursing note, or complaint letter) filed alleging that Cameron failed to receive a response to a filed grievance. In fact, every grievance submitted includes an explanation and solution. Additionally, Cameron has not established that administrative remedies were unavailable to him. See Oliver v. Gafford, 2018 WL 1938309 at *5, 2018 U.S. Dist. LEXIS 69601 at *8-14 (N.D. Fla. Jan. 9, 2018) (citing West v. Peoples, 589 F. App'x 923, 926, n. 4 (11th Cir. 2014) ("As to [plaintiff's assertions that prison officials obstructed his efforts to exhaust his administrative remedies, given the multiple grievances filed by [plaintiff] . . ., the record does not support such a conclusion.").

Accordingly, the undersigned concludes that Cameron failed to exhaust his claims against Defendants as required by 42 U.S.C. § 1997e(a); therefore, Defendants are entitled to summary judgment on Plaintiff Cameron's claims against them.

**B.   No Eighth Amendment Violation.**

Even if Cameron had exhausted his claims against Defendants, Defendants are entitled to summary judgment on Cameron's Eighth Amendment claims because Cameron has failed to carry his burden of showing Defendants acted with deliberate indifference to his medical needs.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).    In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)).    To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).   A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for

a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response

must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain."  Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted).  "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem."  Id.

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious."  An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay."  Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

### 1.   Denial of Free World Medications at Kilby.

Cameron has failed to establish that ADOC's confiscation of his prescribed medications from his personal, free-world doctors rises to a constitutional level.   According to Cameron, he arrived at Kilby with prescription pain medication, including a bottle of 105 Lortab 10mg tablets and "a number of Trazadone (Ultram)" pills.   (Doc. 35 at 19).   The prescriptions were confiscated by Nurse Baker and he was told "it was D.O.C. policy not to give narcotic[s] in prison."   (Id.).   Cameron states that when he asked "What am I supposed to do, suffer?", Nurse Baker replied that she would put him down to see the institutional doctor.   (Id. at 19-20).   Cameron, however did not see a doctor before being transferred from Kilby.   He contends that the supplemental prescription, Naprosyn, ordered by Nurse Baker amounted to no treatment at all in comparison to his narcotic pain medication.   (Id. at 21).

Defendants, through the affidavit of certified nurse practitioner Marianne Baker, assert that Kilby, as the primary intake facility for male inmates entering the ADOC system, has a screening procedure to evaluate and identify the medical needs and chronic conditions of each inmate.   (Doc. 29 at 763).   This includes ensuring that each inmate entering the ADOC system is receiving the appropriate medication for his condition(s). (Id.).   Defendants aver that inmates, including Cameron, are

given the opportunity to discuss their medical conditions and needs and identify previous medications they have been prescribed. (Id.). If inmates arrive at Kilby with prescription medication, the medical staff evaluates whether continuing the medication is necessary or if an alternate medication should be prescribed. (Id.). As indicated by the record, Cameron was prescribed amlodipine, atenolol, hydrochlorothiazide, metformin, and Prilosec by the Kilby medical staff on November 1, 2013, which was one day after Cameron's arrival at Kilby. (Id.). Defendants aver that these medications are regularly prescribed to treat high blood pressure, heart conditions, kidney problems, diabetes, and acid reflux, respectively. (Id. at 763-64). On November 2, 2013, Cameron was prescribed Naprosyn to treat his complaints of discomfort and pain. This prescription was renewed on December 9 and 12, 2013. (Id. at 764). On November 9, 2013, Cameron also received a prescription for Zoloft to treat his dysthymic disorder or depression. (Id.). These prescriptions were reviewed routinely through the chronic care clinic of which Cameron was a participant. (Id.).

It is undisputed that Cameron was evaluated by the medical staff, that the doctor was notified and consulted when necessary, and that Cameron received prescription pain medication and other medicines for his chronic conditions while

at Kilby.   See Monteleone v. Corizon, 686 F. App'x 655, 659-661
(11th Cir. 2017) (finding that, where plaintiff received medical
attention, plaintiff's claim that new medication was ineffective
did not rise to the level of deliberate indifference); Phillips
v. Jaspar Cty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (noting
that a mere disagreement as to the proper drug cannot serve as
the basis for a claim of deliberate indifference.).   It is
further undisputed that Cameron only submitted one sick call
request while at Kilby and it related to a dental issue.   (Doc.
29 at 190, 765).   As such, Cameron has failed to show that while
he was at Kilby, Defendants knew of a serious medical need,
namely his chronic pain, and were deliberately indifferent to
it.

Instead, Cameron's claim centers on the refusal of
Defendants to provide him with the specific narcotic pain
medication he desired. Courts have consistently found that
differences of opinion between an inmate and the prison medical
staff over the specific medication to be provided does not
constitute cruel and unusual punishment.   See Estelle, 429 U.S.
97 at 106; Trotter v. Correctional Medical Services, Inc., 2008
WL 2225696 at *9, 2008 U.S. Dist. LEXIS 109725 at *24 (S.D. Ala.
May 29, 2008) ("It is well-established that a difference in
opinion or a disagreement between an inmate and prison officials
as to what medical care is appropriate for his particular

condition does not state a claim for deliberate indifference to medical needs."); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (noting that a difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), *cert. denied*, 450 U.S. 1041, 101 S. Ct. 1759, 68 L. Ed. 2d 239 (1981). The decision of Defendants to withhold certain narcotic medications and use substitute medication does not establish deliberate indifference. Consequently, Cameron has failed to carry his burden of establishing a constitutional violation for the confiscation and denial of his free-world prescriptions, and Defendants are entitled to summary judgment on this claim as a result. See Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989); Hernandez v. Sec'y Dep't of Corr., 2014 WL 11333109 at *10, 2014 U.S. Dist. LEXIS 193566 at *34 (S.D. Fla., Feb. 7, 2014) (holding that there was no deliberate indifference where plaintiff's hospital prescribed pain medication, Vicodin, was confiscated upon his return to the prison, but plaintiff was prescribed aspirin); Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) ("Nothing in [the applicable] case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor....").

## 2.   Denial of Medical Care.

The medical records before the Court demonstrate that Cameron suffered chronic pain which necessitated medical treatment. However, the claims alleged and the evidence of record do not rise to the level of a constitutional violation. See Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) ("[D]eliberate indifference entails more than mere negligence.").

Defendants have submitted a copy of Cameron's ADOC medical records which document Cameron's medical treatment during the relevant period. A summary of said records is as follows:

> Following Cameron's December 14, 2013 fall, the nursing staff at Kilby examined Cameron and received orders from Dr. Doshi, the institutional doctor, via telephone prescribing Motrin for pain relief and ordering x-rays to be taken two days later. (Doc. 29 at 114, 186-89). Cameron was advised by the nursing staff to sign up for sick call if needed. His only sick call at Kilby involved a request for dental services. (Id. at 765). The x-rays were taken, and the results revealed no dislocation or fracture. (Id. at 190). Cameron was provided a refill of his pain medication on December 17, 2013 after complaining of joint pain. (Id. at 114). Cameron did not file a medical grievance or request to be seen by a doctor until January 6, 2014. The written response to his grievance stated that he had been transferred to Fountain. (Id. at 760).
>
> Cameron arrived at Fountain on January 14, 2014, and the record indicates that he told the screening nurse, "I'm alright." (Id. at 97). The record further reflects that Cameron did not report any hip issue or complaint until January 20, 2014 when he filed a sick call request complaining of severe pain in his right hip. He also asked to see the doctor. (Id. at 203).

The request was received on January 21, 2014, and the nursing notation states that Cameron "has CC [chronic care] appointment" and that he was provided Motrin. (Id.).   When Cameron's prescription for Motrin expired, he filed a medical grievance to obtain pain medicine. He received a Naprosyn prescription on January 27, 2014.   (Id. at 104, 737). Nursing progress notes reflect that Cameron was seen on February 18, 2014, that his chronic pain was assessed, and that a 60-day supply of Naprosyn was prescribed. (Id. at 104, 115).

Cameron was seen by Dr. Iliff, the institutional doctor at Fountain, on March 12, 2014 in the chronic care clinic.  (Id. at 205).   After examining Cameron, Dr. Iliff ordered a prescription for Ultram for Cameron's pain. He also ordered new x-ray scan of Cameron's right hip. Unlike the December 2013 x-ray scan, the new scan showed loosening and migration of the prosthesis.  (Id. at 205-06; Doc. 55-1 at 111). Dr. Iliff requested an orthopedic consult for Cameron, which was approved. Cameron was examined by Dr. Corbett, an orthopedic specialist, on March 27, 2014. (Doc. 29 at 208-210). Dr. Corbett diagnosed Cameron with a failed right total hip arthroplasty and referred him to Dr. Sudakar Madanagopal (Dr. Su) at South Alabama Medical Center.  (Doc. 29 at 213).  The referral to Dr. Su was made and approved the same day. (Id. at 215).

Cameron was evaluated by Dr. Su's staff at the Stanton Road Clinic in Mobile, Alabama, on April 14, 2014. The diagnosis of a failed right total hip arthroplasty was confirmed and orders were given to "repeat CBC, ESR, CRP" and follow up in one week.  (Id. at 225). Cameron received a refill on his Norco prescription for pain management.  (Id. at 105).

Cameron returned to the Stanton Road Clinic on April 21, 2014 and was informed that Dr. Su was unable to see him that day. The notation on the medical record reflects that "Dr. Madanagopal will contact for F/U appointment."  (Id. at 227).

Cameron submitted a sick call request and medical grievance on May 15, 2014. He requested to see a doctor, to have surgery, and renewal of his pain

medication until his surgery. (Id. at 229, 739). His narcotic pain medication was refilled on May 16, 2014. (Id. at 230). Cameron filed another sick call request for pain medication on June 15, 2014, and his pain medication prescription was renewed. (Id. at 232, 115).

On June 30, 2014, Cameron was evaluated by the nursing staff and it was confirmed that his pain medication would continue through July. (Id. at 115). Having received no communication from Dr. Su, the nursing staff filed a consult request for an appointment to be arranged with Dr. Su. (Id. at 233). The request was approved on July 1, 2014, and the appointment was scheduled for July 14, 2014. (Id. at 234, 236).

Cameron was seen at the Stanton Road Clinic on July 14, 2014 and Dr. Su confirmed for the first time that surgery was required. (Id. at 242). According to the consultation notes, surgical plans would be discussed with Dr. Madanagopal, and that "if Dr. Su wants to delay surgery then we will see him in 2 months." (Id.). The surgery was approved by Corizon and scheduled for August 28, 2014. (Id. at 241, 243, 247).

Cameron underwent a surgical repair by Dr. Su on August 28, 2014 and he was released from the hospital on September 3, 2014. (Id. at 251-287). Upon his return from the hospital, Cameron was placed in the prison infirmary where he stated until October 8, 2014. The records reflect that Cameron was taken to every scheduled follow up appointment per Dr. Su's recommendation. (Id. at 118- 173, 288-291, 295-317, 324-325, 329-342, 459-461).

On January 1, 2015, Cameron first complained regarding pain in his right knee and informed medical personnel that the hardware from his previous knee replacement was "protruding." (Doc. 55-1 at 478). At a postoperative follow up appointment with Dr. Su, on January 5, 2015, Cameron complained of bilateral knee pain. Dr. Su ordered aspiration of his right knee. (Doc. 29 at 574). The test was approved, and the findings were negative. (Id. at 573, 576, 581).

On February 2, 2015, Cameron was seen again at the Stanton Road Clinic with complaints of right knee pain. (Id. at 582). The practitioner discussed the possibility of a possible knee replacement, but recommended Cameron be seen by an internal medicine specialist for "medical clearance" for involuntary weight loss. Cameron was also prescribed Ensure to be taken with meals and an anti-inflammatory prescription was ordered. (Id.). On April 7, 2015, Dr. Iliff completed another consult request for Cameron to be seen by an orthopedic specialist. He noted that Cameron's knee had worsen, that he uses crutches and an elevated shoe, and that his mobility is impaired. The request was approved. (Id. at 591-592).

Cameron was again examined at the Stanton Road Clinic on June 8, 2015. It was again recommended that Cameron see an internal medicine doctor for involuntary weight loss concerns and "follow up with Ortho after medical eval." (Id. at 598). A blood workup was conducted on June 11, 2015 and August 11, 2015 and reviewed by Dr. Iliff. (Id. at 601, 609).

Dr. Iliff filed another consult request on August 24, 2015 for Cameron to return to the Stanton Road Clinic to be evaluated for a presumed failed right knee arthroplasy. (Id. at 610). Dr. Iliff noted that this request had previously been approved but that the orthopedic specialist required further evaluation, and the request was again approved. (Id. at 610-611). On September 21, 2015, Cameron was evaluated at the Stanton Road Clinic and was diagnosed with right total knee arthroplasty failure and prescribed a valgus unloading brace to treat the "valgus collapse." The specialist also noted "possible referral for revision right TKA." (Id. at 618). Cameron was told to follow up with a "re-evaluation in two months to monitor continued sx and plan for revision TKA". (Id.). Cameron was approved, fitted for, and received the prescribed knee brace. (Id. at 620, 622-628).

In addition to Cameron's knee and hip complaints, he appears to allege that he was denied or delayed medical care for

a kidney condition in July 2015.  The summary of related medical
records regarding this claim is as follows:

> Cameron was examined in the chronic care clinic on
> July 10, 2015.  Dr. Iliff documented Cameron's
> complaints of "chills and sweats" but his temperature
> was recorded to be within normal limits at 97.5
> degrees.  (Id. at 603). Dr. Iliff completed a consult
> form on July 16, 2015 for Cameron to undergo a renal
> and bladder ultrasound for symptoms that started July
> 14, 2015.  (Id. at 110, 604).  The ultrasound was
> scheduled for July 21, 2015.  (Id. at 606).  The
> results of the ultrasound indicated the presence of
> kidney cysts, a finding which correlated with
> Cameron's symptoms.  (Id. at 607). The medical staff
> continued to monitor Cameron's condition through
> regular urinalysis and antibiotics.  (Id. at 112).

For purposes of this motion, the Court assumes that
Cameron's injury from his fall in the chow hall and his chronic
conditions are considered serious medical needs given Cameron's
medical history.  Thus, to establish a constitutional claim
Cameron must show that Defendants acted wantonly, with
deliberate indifference to his serious medical needs, see Farmer
v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d
811 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99, 111 S. Ct.
2321, 115 L. Ed. 2d 271 (1991); Lancaster v. Monroe Cnty., 116
F.3d 1419, 1425 (11th Cir. 1997); however, Cameron fails to show
that the medical treatment he received was so grossly inadequate
"as to amount to no care at all." McElligott v. Foley, 182 F.3d
1248, 1257 (11th Cir. 1999) ("A core principle of Eighth
Amendment jurisprudence in the area of medical care is that

33

prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

To the extent that Cameron argues that his transfer from Kilby to Fountain was an attempt to deny him medical care, there is nothing in the record to suggest a retaliatory purpose; thus, there is no constitutional violation.  Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976) (holding that there was no constitutionally protected liberty interest against being transferred to other prisons).  Additionally, there is no evidence in the record that Cameron suffered any detrimental effect as a result of his transfer from Kilby to Fountain.  See Townsend v. Jefferson Cnty., 582 F.3d 1252, 1259 (11th Cir. 2009) (Inmate "failed to provide medical records, expert testimony, or other evidence, other than her own testimony, that any delay in treatment caused her to suffer any injury."), opinion vacated and superseded on other grounds by Townsend v. Jefferson Cnty., 601 F.3d 1152 (11th Cir. 2010).

With respect to Cameron's allegations related to denial of medication or missed doses of medication, the law is clear that isolated incidents of missed medication do not establish deliberate indifference. Bishop v. Orr, 180 F. App'x 505 (5th Cir. 2006) (On two occasions, lasting several days, plaintiff did not receive his prescribed medication and suffered injury after falling due to two seizures; however, defendants noted the missed medication and reordered the same, thus, no deliberate indifference was established.). But see Duncan v. Corr. Med. Servs., 451 F. App'x 901, 902-04 (11th Cir. 2012) (summary judgment was denied where plaintiff failed to receive several medications, one for a month, another for 22 days, and a third medication was denied for more than a month, causing him to be rushed to the hospital on 5 occasions); Howell v. Evans, 922 F.2d 712, 721 (11th Cir. 1991) (desire for opioid and narcotic pain relievers over other treatment prescribed does not constitute deliberate indifference).  In this action, Cameron's grievances and sick call requests for medication were promptly and consistently responded to and they resulted in prescription renewals.  At no time was Cameron's chronic pain ignored or treated with deliberate indifference.

Additionally, while Cameron alleges that Defendants failed to provide him with knee replacement surgery, the record before the Court reflects that Defendants regularly examined Cameron

regarding his knee and other complaints and chronic needs,[5] consistently made referrals to specialists, obtained needed diagnostics scans, renewed pain medication prescriptions, and acquired approval for recommended surgeries. With respect to Cameron's knee pain, the record confirms that Cameron was evaluated multiple times by a practitioner at the Stanton Road Clinic for his complaints of knee pain. The last consultation report of record reveals that Cameron was prescribed and fitted for a specific knee brace and told to follow up with a re-evaluation in two months to discuss a plan for revision. (Doc. 29 at 618). While the record supports Cameron's claim that he never received knee surgery, it also establishes that Corizon approved all consult requests related to Cameron's knee, provided the prescribed treatments, and that surgical repair was never recommended by the specialist. Instead, the plan was to try the prescribed knee brace first, and then explore surgery if necessary. Furthermore, Cameron fails to allege, and the record does not show, that he ever filed another grievance or sick call request regarding his knee or his need for surgical repair after he received the prescribed knee brace. For these reasons, the

---

[5]According to Defendants, certified registered nurse practitioners are legally authorized under a licensed physician to evaluate heath status, provide exams and assessments, formulate diagnosis and treatment plans, prescribe and administer tests, procedures, and drugs. (Doc. 29 at 80-81). Thus, even when a doctor did not see Cameron, Cameron received medical care from nursing staff capable of administering the necessary treatments.

record does not support Cameron's claim that Defendants acted with deliberate indifference to his knee pain.

The mere fact that Cameron disagrees with the efficacy of the treatment, simply prefers a different course of treatment, or prefers a different medical practitioner does not state a valid claim of medical mistreatment under the Eighth Amendment. See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop, 871 F.2d at 1035.

Accordingly, Cameron has failed to offer any evidence that demonstrates that Corizon or any medical provider acted with deliberate indifference in providing him medical treatment while incarcerated.

### 3.   Delay of Medical Care.

Cameron claims Defendants are liable for delaying his hip repair surgery for eight months following his fall on December

14, 2013 and for failing to provide treatment for his renal cysts until the symptoms subsided.

> Delay in providing "diagnostic care and medical treatment known to be necessary" can qualify as deliberate indifference. *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."). That delay, however, must be "tantamount to unnecessary and wanton infliction of pain," and [the Eleventh Circuit] *require[s] an inmate who alleges a delay-based Eighth Amendment claim to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir. 1994) (quotation marks omitted), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

Lane v. McWilliams, 2017 WL 3015882 at *6, 2017 U.S. Dist. LEXIS 109537 at *16-17 (N.D. Ga., June 22, 2017) (quoting Simmons v. Monserrate, 489 F. App'x 404, 406-407 (11th Cir. 2012)). To succeed in proving that the delay rose to a constitutional violation, Cameron "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes

omitted); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009).

While it is clear from the facts that Cameron asserted his need and desire for medical treatment for his hip, it cannot be said that Cameron has been denied treatment or that any unreasonable delay ensued. The record before the Court reflects that Cameron received pain medication and an x-ray following his fall at Kilby. The x-ray revealed no dislocation or fracture to be treated. (Doc. 29 at 190). Therefore any delay in treatment at Kilby was based on the objective scan showing there was no need for further or immediate care.

The record also reflects that following Cameron's transfer to Fountain, he was placed in the chronic care clinic and was routinely provided care every three months. His first complaint regarding hip pain was made on January 20, 2014 (but no mention of the previous fall or injury was articulated in the request or the two grievances that followed), and Cameron was provided pain medication for his complaints. (Doc. 29 at 203, 737-738).

The institutional doctor immediately requested an orthopedic consult for Cameron upon knowledge that Cameron's hip prosthesis had migrated since the December scan was taken, and Corizon promptly approved the request. After the orthopedic specialist diagnosed the need for surgical repair, Corizon again acted promptly in approving the request for a consult with the

recommended surgeon.  The record also reflects that Corizon and its medical staff then followed all recommendations and orders from the orthopedic surgeon and his office, including appointments, tests, and medications.

Cameron does not allege, and the record does not reflect, that his condition worsened over the months he waited for surgery.  Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985) (noting that where there is a "'mere delay in surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (citation omitted).  Cameron further fails to show how Defendants are responsible for the delay, as the record indicates that Corizon responded in a timely manner by approving every consult request and transporting Cameron to every scheduled appointment.  The record further reveals that any delay was caused by common scheduling difficulties with the free world surgeon and was not due to non-medical reasons of Defendants.  See Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) ("A defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference.").  Additionally, there appears to have been no emergency need for the hip surgery, as evidenced by the orthopedic consult note dated July 14, 2014, which reflects that if "Dr. Su wanted to

delay surgery then [Cameron would be seen] in 2 months." (Doc. 29 at 242).

Likewise, the record confirms that Cameron received appropriate medical treatment for bilateral kidney cysts and no harm was caused by any potential delay. The record shows that not only did the medical staff conduct multiple urinalysis following Cameron's complaint of blood in his urine, but when three separate urinalysis tests resulted in positive findings an ultrasound was requested, approved, and conducted for Cameron's symptoms of "painless" blood in urine. (Id. at 605). The ultrasound confirmed the presence of bilateral kidney cysts, which Defendants maintain are "typically described as simple kidney cysts" that have an unknown cause and "often disappear without any type of surgical treatment." (Id. at 85). Such seems to accurately describe Cameron's condition, as he affirms the bleeding just stopped "as suddenly as it started." (Id. at 15). Cameron affirms he was given antibiotic treatment, but only after the bleeding had subsided (id.; Doc. 35 at 17), and the record reveals that Cameron continued to be monitored with regular urinalyses, on August 10, 13, and 24, 2015, after the ultrasound diagnosed the cysts. (Doc. 29 at 112).

Accordingly, Cameron has failed to produce supporting evidence that any "delays" in the receipt of medical treatment worsened his conditions or were caused by nonmedical reasons.

41

As such, Cameron may not proceed on his medical deliberate indifference claim, and Defendants are entitled to summary judgment on the deliberate indifference claim.

**4.  Conditions of Confinement.**

Cameron is also suing Defendants Corizon and Thomas for being denied an egg crate or hospital mattress and being forced to sleep on a steel bunk with a thin mattress.  To establish such a claim under the Eighth Amendment, Cameron has the burden at trial of proving three elements: (1) "a condition of confinement that inflicted unnecessary pain or suffering"; (2) "the defendant's deliberate indifference to that condition;" and (3) "causation." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164, 114 S. Ct. 1189, 127 L. Ed. 2d 539 (1994) (internal quotation marks and citations omitted).  "The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries." LaMarca, 995 F.2d at 1538-39.

Under the first component, Cameron must show that the condition "pose[d] an unreasonable risk of serious damage to his future health or safety" and that the "risk of which he complains is not one that today's society chooses to tolerate[;] thus, the challenged condition must be "extreme" and violate "contemporary standards of decency to expose anyone unwillingly

to such a risk." Chandler v. Crosby, 379 F.3d 1278, 1289-90 (11th Cir. 2004) (citing Helling v. McKinney, 509 U.S. 25, 36, 113 S. Ct. 2475, 125 L. Ed. 2d. 22 (1993). The second component requires a showing that Defendants "wantonly permitted the constitutionally infirm condition to persist" while "knowingly or recklessly disregard[ing] [Cameron's] basic needs." LaMarca, 995 F.2d at 1535. The third component "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." Id. at 1538 (quoting Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982)).

Cameron fails to sufficiently show that his health or damage to his hip was put at an unreasonable risk by sleeping on a standard ADOC bed. The record is devoid of medical records or doctor recommendations that indicated the necessity of soft bedding or cautioned against sitting or lying on hard surfaces. See Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981) (If prison conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."). The record is further devoid that any future harm was caused to Cameron from sleeping on the thin mattress.

Simply alleging that the ADOC mattress was uncomfortable is insufficient to carry his burden of proof. See Hamm v. DeKalb

Cnty., 774 F.2d 1567, 1569 (11th Cir. 1985) (holding that sleeping on an unsanitary eating table or on a dirty mattress on the floor did not violate an inmate's Eighth Amendment rights); Alfred v. Bryant, 378 F. App'x 977 (11th Cir. 2010) (holding that there was no constitutional violation where lack of mattress deprived plaintiff of sleep and resulted in fatigue, soreness, and lower back pain); Valdez v. Beard, 2016 WL 1426491, 2018 U.S. Dist. LEXIS 29645 (E.D. Cal. Feb., 22, 2018) (holding that sleeping on a thin mattress does not rise to constitutional level). But see Pierce v. Cty. of Orange, 526 F.3d 1190, 1224 (9th Cir. 2008) (holding that a prison's failure to provide proper mattress to quadriplegic inmate gave rise to Eighth Amendment claim where inmate suffered bedsores as a result).

Accordingly, Cameron's allegations do rise to the level of an Eighth Amendment violation, and Defendants should be granted summary judgment on this claim.[6]

---

[6] Additionally, the conditions of confinement claim fails because Cameron does not connect the named defendants to the alleged constitutional claim. See section IV, C., 1 and 2.

C.   **Cameron Fails to Allege Sufficient Facts to Connect Defendants to the Claimed Constitutional Violations.**

1. **Defendant Thomas is not Liable under Theory of Respondeat Superior.**

Cameron claims that Defendant Thomas is responsible, as a supervisory official, for the denial and delay of medical treatment. (Doc. 29 at 7). Such a claim is rooted in the theory of *respondeat superior* and is not cognizable in a § 1983 action. Edwards v. Ala. Dep't of Corrs., 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . ."); see also Duff v. Steub, 378 F. App'x 868 (11th Cir. 2010) ("Deliberate indifference can be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor.").

> "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (concluding supervisory officials are not liable on the basis of *respondeat superior* or vicarious liability). Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5; *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on

notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *5 (quoting *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir.1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). In instances where supervisory liability is based on a supervisor's custom or policy, a plaintiff must show that the custom or policy was "the 'moving force [behind] the constitutional violation.'" Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

Defendant Thomas avers he has "no personal knowledge of the matters in [Cameron's] Complaint concerning his medical care, his alleged medical complaints, and or any alleged acts or

omissions of any personnel working at Kilby Correctional Facility or Fountain Correctional Facility." (Doc. 29 at 77). Further, Cameron has not pointed to any facts connecting Defendant Thomas to an unconstitutional policy or custom regarding the administration or withholding of prescription medication from inmates, denying or delaying medical care, using deceptive codes or practices to obfuscate suits, or denying egg crate mattresses to punish. [7] Given that Cameron fails to personally link actions of Defendant Thomas to a claim, the undersigned finds that Cameron has failed establish a valid Eighth Amendment claim against Defendant Thomas and summary judgment should be granted in favor of Defendant Thomas.

### 2. Defendant Corizon, Inc. is not Liable as a Private Corporation.

Defendant Corizon, Inc. is a private entity contracted to provide medical services to ADOC prisoners. "For § 1983 liability to attach to a private corporation providing prison

---

[7] In a Motion to Appoint Counsel, Cameron argues that Defendant Thomas was informed of the injury he sustained at Kilby and the lack of medical care received. (Doc. 29 at 779). To establish Defendant Thomas' knowledge of the incident, Cameron submits a copy of the Civil Rights Complaint that appears to have been filed with the United States Attorney's Office in the Southern District of Alabama on July 11, 2014. (Id.). The only reference to Defendant Thomas in the Civil Rights Complaint is Cameron's assertion that he has written a four-page letter to Commissioner Kim Thomas, which is purportedly attached to the complaint. (Id. at 786-87). However, the undersigned finds the record does not contain a letter addressed to Kim Thomas or the ADOC Commissioner. Instead, the attachments to the Civil Rights Complaint include handwritten letters addressed to Ms. Holly L. Wiseman, Special Assistant U.S. Attorney; Ms. Christy W. Graham, Esq.; and Mr. James M. Perry, Esq.; which allege inadequate medical care and seek the assistance of an attorney in filing suit for the wrongdoings, and an unaddressed handwritten "note" that includes the complaint that he needs pain medication until his knee can be surgically replaced. (Id. at 788).

medical care to prisoners, it must be shown that a prisoner's constitutional rights were violated as a result of an established policy or custom of that corporation." Green v. Preemptive Forensic Health Solutions, 2015 WL 1826191 at *3, 2015 U.S. Dist. LEXIS 52715 at *8 (N.D. Ala. April 21, 2015) (citing Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997)). Cameron argues that Corizon has a custom of providing inadequate health care by "falsifying records" and using the same "delay tactics" at all ADOC facilities; he further claims Corizon has policies in place to avoid creating a record of wrongdoing or knowledge of a problem, namely ignoring/not responding to medical grievances and sick call slips and encouraging inmates to "verbally" report worsening conditions instead of putting them in writing. (Doc. 35 at 2-3). Defendants have responded to Cameron's allegations and presented a record that belies these claims.

A review of the record reveals that all sick call requests and grievances were responded to and Cameron fails to allege facts sufficient to show that any written or verbal complaint was ignored.[8]   Further, there is no evidence that Corizon has a

---

[8] As noted supra, while Cameron submitted a single completed grievance form that was omitted from Defendants' submission, the form clearly evidences a written response from the medical staff and belies Cameron's claims that Defendants ignored his grievances. Moreover, Cameron's pleadings are devoid of any details identifying any other written or verbal complaint that was omitted from the record.   Accordingly, Cameron's conclusory statement that Defendants "lied" about the number of grievances submitted will not overcome

policy of falsifying its records to cover up denials and delays of medical care.  In support of this allegation, Cameron disputes Defendants' denial that they had no knowledge of Cameron's hip pain upon his arrival at Fountain.  In their Special Report, Defendants contend that when Cameron arrived at Fountain, on January 13, 2014, he reported to the intake-screening nurse that he was "alright."  (Doc. 29 at 58, 97). Cameron, however, asserts he never stated "he was 'alright' on 1-13-14 because Plaintiff was not here on 1-13-14."  (Doc. 35 at 7).  He further claims he attempted to inform the intake nurse about his fall at Kilby, but the nurse instructed Cameron to report issues to the doctor in the chronic care clinic for which he was enrolled.  (Id. at 7-11).  Lastly, he claims the intake form does not detail any "hip problems" because that is the way Defendants "want it."  (Id. at 10-11).

Taking Cameron's version of the facts as true for purposes of this motion, the undersigned finds no genuine dispute regarding the existence of a policy of falsifying records in order to deny knowledge of a medical need.  The record before the Court confirms the correct date of Cameron's transfer to Fountain, and the intake form in question clearly indicates that the form was created at Kilby on January 13, 2014, and the Fountain portion of the form was completed on January 15, 2014.

---

his burden on summary judgment.  (Doc. 35 at 4-5).

(Doc. 29 at 97).  It is irrelevant to the Court's analysis whether Cameron stated "I'm alright" at the intake screening or not, as the record evidences that Cameron was immediately referred to the chronic care clinic for treatment (just as Cameron describes in his complaint), and he consistently received treatment when requested or needed.  (Id.).  For example, in response to Cameron's first complaint of hip pain, which was filed on January 20, 2014, he was given Naproxen and scheduled to see the doctor at the next chronic care clinic. (Id. at 737-738, 104, 115-116).  The record evidence belies Cameron's claims that Corizon had policies in place to falsify records in order to deny care or knowledge of the need for medical treatment.[9]

Consequently, the undersigned determines that Defendant Corizon should be granted summary judgment on all claims asserted against it.

**IV.   Conclusion.**

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment be **granted**, and that Plaintiff Cameron's action against Defendants Kim Thomas and Corizon, Inc., be **dismissed** with prejudice.

---

[9]  Cameron further suggests that notations in the medical record are "contradictory" to what he was told and instructed.  (Doc. 36 at 3). However, Cameron's failure to provide even one example of this discrepancy establishes the "lack of a genuine, triable issue of material fact" regarding this claim.  Celotex, 477 U.S. at 327.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and

recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**ORDERED** this **22nd** day of **June, 2018.**

**/s/SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**